`Thomas Watts

*v.*

The People of the State of Illinois.

*Opinion filed October 26, 1903.*

1. Criminal law—*larceny defined.* It is essential to the crime of larceny that the accused has wrongfully taken and carried away the property of another, or that, before or at the time of the theft, he has knowingly abetted, aided, encouraged and advised such wrongful taking.

2. Same—*when person is not a principal in commission of crime.* One charged with being an accessory before the fact cannot be constituted a principal in the commission of the crime unless his conduct shows a design to encourage, incite or in some manner abet or assist in the perpetration of the crime.

3. Same—*proof of receiving stolen property does not warrant conviction for larceny.* Proof that accused knowingly received or aided in concealing stolen property does not warrant a conviction under an indictment charging him with larceny.

4. Same—*when possession of stolen property is not prima facie evidence of guilt.* Possession of stolen property immediately after the theft, in order to be *prima facie* evidence of guilt, must be exclusive and such as to indicate that the possessor took the property.

5. Same—*when instruction as to possession of stolen property is misleading.* An instruction that possession of stolen property immediately after the theft is *prima facie* evidence of guilt is misleading, where the evidence explains the possession of such property in a manner entirely consistent with the possessor's innocence.

Writ of Error to the Circuit Court of Sangamon county; the Hon. James A. Creighton, Judge, presiding.

This is a joint indictment, found by the grand jury at the January term, 1903, of the circuit court of Sangamon county against the plaintiff in error, Thomas Watts, and one Thomas Watts, Jr., and one Oliver Tomlin, for the larceny of eight hogs of the value of $100.00, being the property of Samuel H. Jones.

Thomas Watts, Jr., pleaded guilty to the indictment, and testified upon the trial of the cause for the prosecution. The plaintiff in error, Thomas Watts, or Thomas Watts, Sr., was tried jointly with Oliver Tomlin for the

larceny of said hogs and convicted, and was sentenced to imprisonment in the penitentiary at Chester. By the same verdict Oliver Tomlin was found guilty, and judgment of conviction was entered upon the verdict, as rendered against plaintiff in error and Tomlin. Before the judgment was rendered, motions for new trial, and in arrest of judgment, were made and overruled, to which action of the court exception was duly taken. The present writ of error is sued out by Thomas Watts, or Thomas Watts, Sr., the plaintiff in error, for the purpose of reviewing said judgment.

The indictment contains only one count, and that is a count for larceny, the words of the indictment being as follows: "That on the 27th day of January, A. D. 1903, at the county of Sangamon in the aforesaid State of Illinois, Oliver Tomlin, Thomas Watts, and Thomas Watts, Jr., eight hogs, the personal goods, chattels and property of Samuel H. Jones of the value of $100.00 did then and there unlawfully and feloniously steal, take and carry away, contrary to the form of the statute in such case made and provided," etc.

The material facts of the case are substantially as follows: Thomas Watts, Jr., was the son of the plaintiff in error, and was married and lived with his family until about two weeks before the offense was committed, during which time he lived at the house of his father, the plaintiff in error. On the night of January 20, 1903, Thomas Watts, Jr., and Oliver Tomlin, who was about nineteen years old and was a coal miner, met at a saloon in Springfield, and went from there to the farm of Samuel H. Jones about four and a half miles south-west of Springfield, and drove away eight hogs valued at $100.00. They arrived in the city with said hogs about five o'clock, or between four and five o'clock, the next morning; when they arrived at the home of the plaintiff in error where Thomas Watts, Jr., was then staying, they drove the hogs through the barn into a chicken lot on the prem-

ises, and left them there until noon of that day. Thomas Watts, Jr., and Oliver Tomlin went down town, leaving the hogs there on the premises of plaintiff in error, in order to secure a wagon to haul the hogs to a slaughter-house, and dispose of them; Thomas Watts, Jr., secured a wagon during the morning of January 21, and about noon the hogs were taken away from the premises of plaintiff in error, and sold to one Charles Metzger, a butcher in Springfield, for the sum of $100.50. The sale was made by Thomas Watts, Jr., and he received a check from Metzger in payment, payable to the order of his father, Thomas Watts, Sr. The evidence tends to show, that Metzger inquired of Thomas Watts, Jr., whether the hogs belonged to him or his father, and, upon receiving a reply that it did not make any difference whether they belonged to the one or the other, Metzger concluded to make the check payable to the order of Thomas. Watts, Sr.

Plaintiff in error was employed as a janitor and attended to making fires and looking after furnaces in a number of private dwellings and business houses in Springfield. The testimony shows, that he was in the habit of getting up in the morning between four and five o'clock, and going to his barn to hitch his horse to his buggy or surrey, and driving down town to attend to his work. The plaintiff in error testified in his own behalf upon the trial of the case, and swore that he had a barn upon his premises, and therein had two stalls, in one of which he kept a cow and in the other his horse; that in the barn was hay, hanging from the cracks in the roof of the barn, and scattered about on the floor; that, on the morning of January 21, he went down to the barn, and went in, and lighted the lantern, which hung near the back door of the barn, looking out upon the alley, where his surrey stood; that he harnessed his horse and hitched him to the surrey and drove down town. Plaintiff in error swears that, when he went to the barn, he saw no hogs, and did not know that any hogs were there,

and that he did not see either Thomas Watts, Jr., or Tomlin. He says that he came back from his work about 9:30, and found the hogs in the barn, and inquired of some members of his family whose hogs they were, but they were unable to tell him; that about noon his son came back, and he asked him to whom the hogs belonged, and his son told him that they belonged to Tomlin; that about noon a wagon, which his son had gone down town and hired, was driven up to the stable for the purpose of carrying the hogs down town. Plaintiff in error admits that his son, and the man who drove the wagon, did not seem to understand how to get the hogs into the wagon, and he borrowed some boards of a neighbor to help them load the hogs into the wagon, and they were driven off. One of the daughters of plaintiff in error testifies that, after Thomas Watts, Jr., her brother, had driven off with the hogs, Tomlin came up with a wagon, and asked where Thomas Watts, Jr., was, and she told him that he had gone to town with the hogs.

In the afternoon of that day, about 3:30, plaintiff in error was down town on the east side of the square in Springfield opposite the court house. He says that he went down to see the sheriff about making a loan of money from him, but was unable to find the sheriff who was out of town. While he was talking with a Mr. Wright on the east side of the square opposite the court house, Thomas Watts, Jr., came along, and asked him to go to the bank with him. He says he went with his son to the bank. At the bank his son endorsed the check in the name of Thomas Watts, and the cashier or teller paid the amount of the check, $100.50, to Thomas Watts, Jr. The plaintiff in error told the cashier that Thomas Watts was his son, and the cashier or teller, who knew Thomas Watts, Sr., paid the money. In other words, the plaintiff in error seems to have identified his son. Plaintiff in error says that he did not see the check, nor know to whose order it was payable, and did not know the amount

of it, and that he never received any of the proceeds of it. In the evening of that day about six o'clock, Thomas Watts, Jr., and Tomlin, and another young man, and two or three of the daughters of plaintiff in error, and plaintiff in error himself, were in the house of plaintiff in error, and there on that evening, in the presence of plaintiff in error, Thomas Watts, Jr., paid about $30.00 or $32.00 of the money to Tomlin. Tomlin and Thomas Watts, Jr., then left. Thomas Watts, Jr., was not at the house of his father on the night of January 20, nor on the night of January 21. As we understand the evidence, the three men, Thomas Watts, Sr., Thomas Watts, Jr., and Tomlin were arrested on January 22. Mr. Jones testified, that he identified the hogs as his hogs by a brand or mark, which he had placed upon them.

JOHN G. FRIEDMEYER, and G. A. SANDERS, for plaintiff in error.

H. J. HAMLIN, Attorney General, and W. E. SHUTT, Jr., State's Attorney, for the People.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

There can be no doubt from the evidence in this case, that Thomas Watts, Jr., and Oliver Tomlin were guilty of stealing the hogs in question. The former pleaded guilty, and was sentenced to the penitentiary; and the latter, upon the trial, was found guilty, and was also sentenced, and did not join in the present writ of error. So far, however, as the plaintiff in error is concerned, we are unable to find any evidence in the record, which tends to show that he was guilty of the larceny of the hogs.

Section 167 of division 1 of the Criminal Code of Illinois defines larceny as follows: "Larceny is the felonious stealing, taking and carrying, leading, riding or driving away the personal goods of another. Larceny shall embrace every theft, which deprives another of his money

or other personal property, or those means or muniments by which the right and title to property, real or personal, may be ascertained," etc. (1 Starr & Curt. Ann. Stat.— 2d ed.—p. 1316).

Section 2 of division 2 of the Criminal Code defines an accessory as follows: "An accessory is he who stands by, and aids, abets or assists, or who, not being present, aiding, abetting or assisting, hath advised, encouraged, aided or abetted the perpetration of the crime. He who thus aids, abets, assists, advises or encourages, shall be considered as principal, and punished accordingly." (1 Starr & Curt. Ann. Stat.—2d ed.—pp. 1354, 1355). There is no evidence in the record, which tends to show that plaintiff in error knew anything about the scheme or plan to steal the hogs before the theft was committed. There is no evidence to show, that he aided, abetted or assisted Thomas Watts, Jr., and Oliver Tomlin in going after the hogs, or driving them away from the Jones farm, or putting them in the barn, or the lot adjoining the barn. It is an essential element of the crime of larceny that the property of the owner has been wrongfully taken and carried away, or that the person accused of the larceny has knowingly abetted, aided, encouraged and advised such wrongful taking before the actual theft of the property, or at the time thereof. (1 Bishop on Crim. Law,— 5th ed.—secs. 666, 668; Wharton on Crim. Law,—10th ed. —secs. 237, 238). A person, charged with being an accessory before the fact, cannot be constituted a principal in the commission of the crime, unless there is something in his conduct showing a design to encourage, incite, or in some manner aid, abet or assist the perpetration of the crime. (*White* v. *People*, 139 Ill. 143; *Lamb* v. *People*, 96 id. 73).

Where the evidence fails to sustain a conviction in a criminal case, the judgment will be reversed. (*Miller* v. *People*, 90 Ill. 409; *Randall* v. *People*, 63 id. 202; *Gutchins* v. *People*, 21 id. 641; *McMahon* v. *People*, 120 id. 581; *Clark* v. *People*, 111 id. 404).

Section 239 of division 1 of the Criminal Code provides as follows: "Every person who, for his own gain, or to prevent the owner from again possessing his property, shall buy, receive or aid in concealing stolen goods, or anything the stealing of which is declared to be larceny, or property obtained by robbery or burglary, knowing the same to have been so obtained, shall be imprisoned in the penitentiary not less than one nor more than ten years, or if such goods or other property or other thing does not exceed the value of $15.00, he shall be fined not less than $1000.00, and confined in the county jail not exceeding one year." (1 Starr & Curt. Ann. Stat.—2d ed. —p. 1340). If the evidence in this case tends to establish any offense committed by the plaintiff in error, it is not larceny, but the offense specified in said section 239. Larceny is one offense, and receiving or aiding in concealing stolen property is another and entirely different offense. All the acts and circumstances developed by the evidence, which connect the plaintiff in error in any way with the transaction here involved, were subsequent to the theft of the hogs. If the plaintiff in error was an accessory, he was an accessory after the fact. But evidence, that a person, for his own gain or to prevent the owner from again possessing his property, has received or aided in concealing stolen goods, knowing the same to have been stolen, does not establish or prove the crime of larceny.

The indictment in this case contains only one count, and that is a count for larceny. There is no count in the indictment, charging plaintiff in error with receiving or concealing stolen property, knowing that it was stolen. If the proof shows that plaintiff in error was guilty of aiding Thomas Watts, Jr., and Oliver Tomlin in concealing the property or in disposing of it, knowing that it was stolen property, the offense proved is different and distinct from the offense charged. The offense charged is larceny, and not the concealment of stolen goods know-

ing them to be stolen. The proof of an offense under section 239 of the Criminal Code cannot support a conviction under section 167 above referred to. (*Gutchins* v. *People, supra*). A receiver of stolen property has been defined to be "one who receives into his possession or under his control with felonious intent any stolen goods or chattels with knowledge that they have been stolen." "Under statute in most jurisdictions in the United States, the offense is a distinct and substantive crime in itself, and is not merely accessorial to the principal offense of larceny.". (24 Am. & Eng. Ency. of Law,—2d ed.—p. 44). It is true that, when a defendant is put upon his trial for a crime which includes an offense of an inferior degree, he may be acquitted of the higher offense and convicted of the lesser, although there may be no count in the indictment specifically charging the particular offense. For instance, where the crime charged is murder, the accused may be convicted of manslaughter. In such cases, the graver offense necessarily includes the lesser. But if the lesser offense is not a constituent element in the higher crime charged, no conviction can be had. But "the offense of which an accessory after the fact may be guilty, is not included in, nor has it any connection with, the principal crime. The one cannot be committed until the principal offense is an accomplished fact. Therefore, one indicted for larceny cannot be convicted of being an accessory after the fact." (*Reynolds* v. *People*, 83 Ill. 479).

In *Huggins* v. *People*, 135 Ill. 243, we said (p. 245): "By the statute, (Crim. Code, secs. 239, 241,) the offense of receiving or buying stolen property, or aiding in concealing the same, for gain, or to prevent the owner from re-possessing himself thereof, with knowledge that it has been stolen, is made a substantive crime, subject to punishment, without reference to the trial or conviction of the person committing the larceny." (See also *Aldrich* v. *People*, 101 Ill. 16; *Friedberg* v. *People*, 102 id. 160; *Gunther* v. *People*, 139 id. 526),

In the case at bar, the court instructed the jury in behalf of the prosecution, that, "if you believe from the evidence beyond a reasonable doubt, that the defendants acting together, each performing a part with knowledge of what was being done by the others, did feloniously steal, take and carry away the hogs in question, then you will find both the defendants guilty." By another instruction for the prosecution the court told the jury that "if you believe from the evidence beyond a reasonable doubt that the defendants acting together, each performing a separate part by common understanding, did feloniously steal, take and carry away the hogs described in the indictment as therein charged, then all are equally guilty, and in such case you will find them guilty." These instructions were not based upon any evidence, for the reason that the plaintiff in error did not perform a separate part by common understanding with Tomlin or with Thomas Watts, Jr., in stealing, taking and carrying away the hogs, nor is there any evidence that the plaintiff in error acted with Thomas Watts, Jr., and Oliver Tomlin in what they did in the matter of stealing and carrying away the hogs. If he did anything that was criminal in its nature, it was in aiding them to conceal or dispose of the hogs after they were stolen. Inasmuch, however, as he was not indicted for the latter offense, but was only indicted for the larceny of the hogs, the present conviction cannot stand.

Even though it were proper under the present indictment for larceny to prove or attempt to prove that plaintiff in error was guilty of the offense of aiding Thomas Watts, Jr., and Tomlin in concealing the stolen goods, knowing the same to have been stolen, yet the evidence upon this subject is not sufficient to leave the mind free of a reasonable doubt as to the guilt of the plaintiff in error. Thomas Watts, Jr., was put upon the stand as a witness for the prosecution. He sustains the testimony of the plaintiff in error, that the latter had nothing to

do with the theft of the hogs. Thomas Watts, Jr., says: "We got them late at night and got to town early in the morning. We drove them through the barn into the chicken yard at father's. * * * I got the hogs in a pen at home about five A. M. * * * Father did not know where I got the hogs. * * * There was no one up at home when we got there with the hogs; I walked towards the house and saw father come towards the barn; saw him put the harness on the horse, and hitch up and go to town; that was the last I saw of him; I did not go into the house then. Tomlin was with me and we went from there up town; nothing was said to father about hogs that morning; he did not know there were any hogs on the place; * * * I said nothing to father about having any hogs on the place, and never spoke to him that morning we brought the hogs; we put the hogs in the barn after father left the place; he did not see the hogs that morning; just before dinner when I came home, father asked me who those hogs belonged to; I just studied a little and told him they belonged to Mr. Tomlin; he asked me how they got there, and I told him we had driven them; that they got tired, and we could not make it to the slaughter-house; and we had to let them stay there until we could get them away; I never told him they were my hogs, or that I had any interest in them; father did not assist me in any way in selling the hogs, or collecting the money for them. He had nothing to do with it at all. He went to the bank with me at my request, where I cashed the check; when I asked him to go with me, he did not know I had a check for any amount, and he was not near enough to me in the bank when I endorsed the check to tell what it was for, or to whom it was to be paid. My father did not counsel, aid, advise or encourage me to take or dispose of the hogs in any way." This testimony came from a witness for the State, and confirms in every respect the testimony of plaintiff in error himself.

It is true that the witness, Tomlin, contradicts in some particulars the testimony of plaintiff in error and Thomas Watts, Jr. Tomlin says that, after they had put the hogs in the barn on the morning of January 21, plaintiff in error came to the stable, and saw the hogs, and told him and Thomas Watts, Jr., to go to the house, and that they did go to the house before Thomas Watts, Sr., went to the city. But he is contradicted in this statement, not only by plaintiff in error and Thomas Watts, Jr., but by three or four other witnesses. Tomlin also says that, when they went into the barn, they found some paper in a barrel, and took the paper out and made a fire on the floor of the stable and lay down by it to keep warm. The evidence shows that this was improbable, inasmuch as there was hay on the floor and hay hanging from the cracks in the loft; and the barn would inevitably have been set on fire, if such a fire had been started as he speaks of. In many respects the testimony of Tomlin seems to be improbable.

In addition to this, ten reputable citizens in Springfield, some of whom had known the plaintiff in error as much as thirty years, and others, all the way from ten to twenty years, testified that his general reputation for truth and honesty was good in the community where he lived. Some of these persons were his near neighbors, and for others he had done work for many years. One witness testifies that he had worked for him for twelve years, and he never heard his general reputation for truth and honesty questioned until the trial of the present case.

By the second instruction, given for the prosecution, the court told the jury "that the possession of stolen property soon after the commission of the theft is *prima facie* evidence, that the person, in whose possession it is found, is guilty of the wrongful taking, and unless the other evidence in the case, or the surrounding circumstances are such as to raise a reasonable doubt of his

guilt, such possession is sufficient evidence to warrant a conviction." Looked at abstractly and by itself, this instruction is not an erroneous statement of the law.

In *Comfort* v. *People*, 54 Ill. 404, we said that the possession of property soon after it is stolen, while such possession "is *prima facie* evidence of guilt,—when it is explained by other evidence or the surrounding circumstances, should not control. If the possession is recent after the theft, and there are no attendant circumstances, or other evidence to rebut the presumption, or to create a reasonable doubt of guilt, the mere fact of such possession would warrant a conviction. * * * All the books agree that a recent possession, after the theft, is sufficient to warrant a conviction, unless the attending circumstances or other evidence, so far overcomes the presumption thus raised, as to create a reasonable doubt of the prisoner's guilt, when an acquittal should follow." (See also *McMahon* v. *People*, 120 Ill. 581; *Langford* v. *People*, 134 id. 444; *Magee* v. *People*, 139 id. 138; *Gutchins* v. *People*, *supra; Sahlinger* v. *People*, 102 Ill. 241). But we think that this instruction, under the peculiar circumstances of this case, was calculated to mislead the jury to the prejudice of the plaintiff in error. It substantially assumes that the stolen property was found in the possession of the plaintiff in error. In *Smith* v. *People*, 103 Ill. 82, a similar instruction was held to be good, and it was there intimated that it assumed that the accused was in possession of the stolen property recently after the theft; but, there, it was proved and admitted by the accused that the stolen property came to his possession within four days after it was proven to have been stolen. In the case at bar, however, it was not admitted, nor is it altogether clear that the proof showed, that the stolen property was in the possession of the plaintiff in error at all at any time. It is true, that the hogs, after being stolen, were driven through the barn of plaintiff in error and into a yard adjoining the

barn called the chicken yard, and that both the chicken yard and the barn were a part of the premises of plaintiff in error. But the rule, that, where stolen property is found in the possession of a person immediately after the commission of a theft, it is *prima facie* evidence of guilt, refers to a possession which is exclusive. "In order that the recent possession shall be evidence of guilt, it must be exclusive in the defendant; that is, it must be such as to indicate that the defendant, and not some one else, took the property. If the place, where the property is found, is such that others have access thereto as well as the defendant, the property cannot be said to be in the exclusive possession of the defendant, and the circumstance would not be evidence of his guilt." (1 McClain on Crim. Law, sec. 620). The evidence shows that Thomas Watts, Jr., the son of plaintiff in error, was staying at his father's house, and had been staying there for two weeks. He had access to the premises in question, as well as plaintiff in error. The hogs, even after they were taken to the premises of plaintiff in error, were, as a matter of fact, in the possession of Thomas Watts, Jr., and Oliver Tomlin. Some cases hold that, although it appears that the goods are found in a place not exclusively occupied or controlled by the defendant, the fact, that other persons had access to the place, merely weakens but does not destroy the effect of the evidence. (1 McClain on Crim. Law, sec. 620; *Padfield* v. *People*, 146 Ill. 660.) But, even under this view of the doctrine of possession of stolen property as evidence of guilt, the instruction in question was too strong in assuming that the possession of the property was solely the possession of the plaintiff in error, and excluded from the consideration of the jury the fact, that Thomas Watts, Jr., had access to the place where the hogs were taken, as well as plaintiff in error.

In *Conkwright* v. *People*, 35 Ill. 204, it was said (p. 206): "The possession of the stolen property, as has already

been seen, is in itself a strong presumption of guilt, though it applies only when the possession is of that kind which manifests that the stolen goods have come to the possession by his own act, or at all events, with his undoubted concurrence. * * * Cases frequently arise of the discovery of property, recently after its being stolen, in the house of a particular person, but the weight of this evidence depends upon the accompanying circumstances of the case. It is carefully to be observed, says Mr. Starkie, that the mere finding of stolen goods in the house of the prisoner, when there are other inmates capable of stealing the property, is insufficient evidence to prove a possession by the prisoner. (2 Starkie on Evidence, 450). This seems to be the recognized rule of the courts, in reference to this character of testimony. And it is based upon reasons obvious to every one. Possession of stolen property by a person soon after the theft may be the strongest character of evidence of his guilt, when considered in the light of surrounding circumstances, whilst under different circumstances it might be slight, if even any, evidence of guilt. The previous character of the accused may, in such a case, if shown to be good, repel all presumption of guilt. In such a case, everything connected with the possession must be considered, such as its proximity to the larceny, whether it was concealed, whether the party admitted or denied the possession, whether other persons had access to the place where it was found, and the demeanor of the accused, and his good character. These circumstances, when in evidence before the jury, are proper to be considered by them."

In 18 American and English Encyclopedia of Law, (2d ed. p. 489,) it is said: "In order that an inference of guilt may be drawn from the unexplained possession of goods recently stolen, it must be an exclusive personal possession on the part of the accused. * * * If, however, the place where the goods were found was accessible to others capable of stealing, the inference cannot

be drawn, though the fact is entitled to consideration in connection with the other facts of the case. * * * The presumption, arising from the possession of recently stolen goods, may be overcome by the proof of any facts inconsistent with the theory of guilt, such as the good character of the accused, or his conduct at the time he was found in possession; or the fact, that he made no attempt to conceal his possession. * * * The presumption of guilt, which arises from the possession of goods recently stolen, may be rebutted by an explanation or account given by the accused as to how he acquired the possession. * * * The explanation given must be both reasonable and credible."

In the case at bar, plaintiff in error was told by his son that the hogs belonged to Tomlin, and that they put them in the barn, because they had driven them so far that they were tired, and he wanted to rest until they could get a wagon to carry the hogs into town. Plaintiff in error states that, until he returned home from town between nine and ten o'clock, he did not know that the hogs were in his barn, or who had put them there, or to whom they belonged, and did not ascertain the facts in regard to their being there, until he learned them from his son when he came home at noon. It seems to us from the evidence, that he gives a natural and reasonable explanation of the presence of the hogs upon his premises, and of his possession of them, so far as their being upon his premises under the circumstances stated constituted possession. The jury had a right to consider the fact, that other persons had access to the premises besides the plaintiff in error, and that, therefore, his possession was not exclusive. The jury had also a right to take into consideration the testimony as to the good character for honesty and uprightness of the plaintiff in error. By saying that evidence of possession of goods immediately after the theft is presumptive or *prima facie* proof of guilt, the courts usually mean that such evidence will support

a conviction in the absence of anything explaining or contradicting it. (1 McClain on Crim. Law, sec. 618; *Comfort* v. *People,* 54 Ill. 404). "It is recent possession unexplained, that is, without circumstances appearing which indicate that such possession is consistent with defendant's innocence, which constitutes evidence against him." (1 McClain on Crim. Law, sec. 618). The evidence in this case explains the presence of the stolen hogs upon the premises of plaintiff in error in such a manner as is entirely consistent with his innocence.

For the reasons above stated, we are of the opinion that the judgment of the trial court is wrong. Accordingly, the judgment is reversed, and the cause is remanded to the circuit court of Sangamon county for further proceedings in accordance with the views herein expressed.

*Reversed and remanded.*